UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN TRANSIT INSURANCE COMPANY,<br><br>      **Plaintiff,**<br><br> -against-<br><br>QBS SOLUTIONS INC., JOSEPH SOFIEV, JOHN DOES 1 THROUGH 5 AND ABC CORPORATIONS 1 THROUGH 5,<br><br>      **Defendants.** | CIVIL ACTION<br><br>22-CV-6585<br><br>COMPLAINT<br><br>(TRIAL BY JURY DEMANDED) |

Plaintiff American Transit Insurance Company ("**Plaintiff**"), by its attorneys, Morrison Mahoney, LLP, for its Complaint against Defendants Joseph Sofiev ("Sofiev"), QBS Solutions Inc. ("QBS Solutions") (Sofiev and QBS Solutions are collectively referred to as "**Retail Defendants**"), John Does 1 through 5, (collectively "**Wholesale Owners**"), and ABC Corporations 1 through 5 (collectively "**Wholesalers**") (Wholesalers and Wholesale Owners are collectively referred to as "**Wholesale Defendants**"), (collectively the Retail Defendants and Wholesale Defendants are referred to herein as "**Defendants**") allege as follows:

## PRELIMINARY STATEMENT

1. From at least February 2018 and continuing through the date of the filing of this Complaint, Defendants engaged in a scheme to defraud automobile insurance companies, including Plaintiff, through New York State's No-fault system.

2. This action seeks to recover more than $136,300.00 that Defendants stole from Plaintiff through the submission of thousands of false and/or fraudulent insurance claims for durable medical equipment ("DME") and/or orthotic devices. As used herein, (i) "DME" generally refers to equipment and/or supplies used for medical purposes by individuals in their homes, including, among other things, cervical pillows, cervical traction units, cold/hot water circulating pumps, EMS units, hot/cold packs, infrared heat lamps, lumbar cushions, massagers, mattresses

and whirlpools; and (ii) "orthotic devices" generally refers to items that are used to support a weak or deformed body member or to restrict or eliminate movement for medical purposes.  Such items include, but are not limited to, back braces, cervical collars, knee braces, shoulder braces and wrist braces.

3.      At all relevant times mentioned herein, each and every DME and/or orthotic device supplied by QBS Solutions was provided pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, as defined below.

4.      To execute the scheme to defraud alleged herein, Sofiev, through QBS Solutions, entered into arrangements with one or more of the Wholesale Defendants, and one or more medical clinics operating in the New York metropolitan area that bills No-fault insurers for medical services (hereinafter "No-fault Clinics").

5.      Pursuant to these arrangements and in exchange for kickbacks and/or other financial compensation, the managers, owners and/or controllers of No-fault Clinics, which are not named as defendants in this action, facilitated the scheme in several ways, including but not limited to:

> (i.)   ensuring that their associated doctors and/or chiropractors (hereinafter "Health Care Practitioners" or "HCPs") prescribed large amounts of virtually identical DME and/or orthotic devices to their patient population, pursuant to a predetermined course of treatment irrespective of medical necessity, with the prescribed items being dictated by QBS Solutions;

(ii.) fabricating and/or falsifying DME prescriptions by:

    a.   utilizing blank prescription forms signed by their HCPs in order to unilaterally fill in the prescription with expensive and unnecessary DME and/or orthotic devices; and

    b.   fraudulently altering otherwise valid prescriptions issued by their HCPs by adding or changing the DME and/or orthotic device(s) prescribed in order to conform the prescription to a pre-determined protocol designed to maximize reimbursement by insurance companies; and

(iii.) ensuring that the prescriptions were sufficiently generic so that the nature, quality, and cost of any DME and/or orthotic device could not be verified based on the description of the prescribed item alone.

6.    The use of generic descriptions in the fraudulent prescriptions enabled the Retail Defendants to: (i) misrepresent the nature and quality of the DME and/or orthotic devices prescribed to the patient, if any items were legitimately prescribed at all; (ii) misrepresent the nature and quality of the items that were dispensed to the patient, if any items were dispensed at all; and (iii) fraudulently bill for products that would result in the highest forms of reimbursement from insurers, in general, and Plaintiff, in particular.

7.    Pursuant to the fraudulent prescriptions, QBS Solutions routinely provided (or purported to provide) a nearly identical battery of DME and/or orthotic devices to persons injured in automobile accidents insured by Plaintiff (hereinafter "Covered Persons"), regardless of medical necessity, in order to maximize reimbursement from insurers in general, and Plaintiff in particular.

8.    On information and belief, the Retail Defendants then paid kickbacks or other forms of compensation to the No-fault Clinics for the fraudulent prescriptions, which were transmitted directly by the Clinics to the Retail Defendants to support their claims for reimbursement.

9.    In many instances, Sofiev submitted to Plaintiff, through QBS Solutions, prescription forms which they knew to be fabricated and/or fraudulently altered, in order to

misrepresent the number and/or quality of DME and/or orthotic devices actually prescribed by the No-fault Clinics' HCPs, if any were prescribed at all.

10.     On information and belief, pursuant to similar agreements, and in exchange for kickbacks and/or other financial compensation, including, but not limited to, a share in the profits of the scheme to defraud, the Wholesale Defendants provided QBS Solutions with inexpensive DME and/or orthotic devices, along with fraudulent wholesale invoices that grossly inflated the amounts QBS Solutions paid for the DME and/or orthotic devices. Other times, the Wholesale Defendants provided QBS Solutions with fraudulent wholesale invoices that reflected DME and/or orthotic devices that were never actually provided to QBS Solutions.  In fact, irrespective of whether any DME and/or orthotic devices were actually provided to QBS Solutions, the wholesale invoices typically reflected prices that exceeded 10 times the actual prices that QBS Solutions paid to the Wholesale Defendants and/or were sufficiently generic and devoid of detail to allow QBS Solutions to seek reimbursement for expensive, complex DME when simple and/or counterfeit DME was provided.

11.     On information and belief, in some instances, to create the illusion that QBS Solutions paid the grossly inflated prices on the wholesale invoices, as more fully alleged in the "Money Laundering Scheme" section below, QBS Solutions issued checks to the Wholesale Defendants for the full amounts reflected on the wholesale invoices. QBS Solutions then used those checks to demonstrate to Plaintiff, and others, that they had paid the false wholesale invoice amounts. In reality, the Wholesale Defendants converted the checks they received from QBS Solutions to cash and secretly returned to QBS Solutions a portion of the profits of the scheme through kickbacks or other financial compensation. These covert cash transactions were facilitated

through various clandestine arrangements among QBS Solutions, the Wholesale Defendants, check brokers, check cashers and/or others unknown to Plaintiff.

12.     On information and belief, through these transactions, QBS Solutions was able to surreptitiously obtain cash, which then was used for, among other things, kickbacks to the No-fault Clinics from which QBS Solutions received fraudulent prescriptions for DME and/or orthotic devices.

13.     In other instances, Sofiev, through QBS Solutions, purchased inexpensive DME and/or orthotic devices from wholesalers not named as defendants herein that were counterfeit or knockoffs of trademarked items made by other manufacturers. At all relevant times mentioned herein, QBS Solutions knew that it could purchase the counterfeit items at a fraction of the cost of the actual, trademarked items and bill for such items under expensive codes for complex DME when, in fact, the items were cheaply manufactured.

14.     In furtherance of the scheme to defraud alleged herein, QBS Solutions purchased the cheap DME and/or orthotic devices in bulk and routinely mispresented the nature, quality, and cost of the items in order to fraudulently obtain and maximize its reimbursement far in excess of the amounts it was entitled to receive under the No-fault Law.

15.     After obtaining the fraudulent prescriptions from the No-fault Clinics and the inflated invoices from the Wholesale Defendants and/or counterfeit DME from the non-party wholesalers and suppliers, Sofiev, through QBS Solutions, generated and submitted bills to Plaintiff, among others, knowingly misrepresenting the actual amounts they paid for the DME and/or orthotic devices, as well as the nature and quality of the items, and the medical necessity of the purportedly prescribed DME and/or orthotics.

16.     In order to prevent Plaintiff from determining the appropriate charges associated with any such DME and/or orthotic device, or whether the specific DME and/or orthotic device billed for was medically necessary, the documents submitted to Plaintiff by Sofiev through QBS Solutions in support of their fraudulent claims, including the wholesale invoices, deliberately omitted and/or misrepresented basic information about the DME and/or orthotic devices, including, but not limited to, the manufacturer, make, model, size, features and/or functions of the item and/or included information that was meaningless in determining the kind and quality of any specific DME and/or orthotic device.

17.     On information and belief, Sofiev, through QBS Solutions, routinely purchased basic, low-quality, and inexpensive items from the Wholesale Defendants or other suppliers, but submitted documents, including, but not limited to, in some instances, inflated wholesale invoices, to insurers, including Plaintiff, that failed to accurately reflect the actual nature, quality, and purchase price of each item.

18.     In support of their claims for reimbursement, and to facilitate the fraud described herein, Sofiev, through QBS Solutions, generated delivery receipts that included a space for the patient's signature to document receipt of each item for which Sofiev, through QBS Solutions, billed Plaintiff.

19.     On information and belief, often pursuant to the agreements between the Retail Defendants and the No-fault Clinics, patients were directed to sign these delivery receipts upon presenting to the No-fault Clinics, irrespective of whether any DME and/or orthotic devices were provided to the patient at that time. The Retail Defendants then submitted to Plaintiff the signed delivery receipts as purported evidence of DME and/or orthotic devices allegedly supplied to a patient, when, in fact, no DME or orthotic device was ever supplied to the patient.

20.     In order to execute the scheme to defraud, at all relevant times mentioned herein, Sofiev, through QBS Solutions, engaged in one or more of the following actions: (i) paying kickbacks or other financial compensation to No-fault Clinics in exchange for fraudulent prescriptions of DME and/or orthotic devices; (ii) obtaining prescriptions that were provided pursuant to a predetermined course of treatment as opposed to medical need; (iii) obtaining and submitting to insurers, in general, and Plaintiff, in particular, prescriptions which they knew to be fabricated and/or fraudulently altered; (iv) paying fees to one or more Wholesale Defendants in exchange for fraudulent wholesale invoices that QBS Solutions, in turn, would use to substantiate bogus claims for reimbursement of No-fault benefits; (v) arranging for the No-fault Clinics to have assignments of benefits and acknowledgement of delivery of receipt forms pre-signed by Covered Persons to ensure that they had all of the documents necessary to submit claims to insurers, in general, and Plaintiff, in particular, and (vi) systematically submitting bills to insurers, in general, and Plaintiff, in particular, for DME and/or orthotic devices that Sofiev, through QBS Solutions, determined should be prescribed by the No-fault Clinics, with virtually every Covered Person receiving substantially similar DME and/or orthotic devices.

21.     At all relevant times mentioned herein, each and every bill and supporting documentation submitted by QBS Solutions contained the same or similar false representations of material facts, including, but not limited to one or more of the following: (i) false and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to Covered Persons; (ii) false and misleading statements as to the amounts QBS Solutions was entitled to be reimbursed under the No-fault Law; (iii) false and misleading statements that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the Covered Persons; (iv) false and misleading prescriptions for the DME and/or orthotic devices purportedly

supplied to Covered Persons, which generically described the item(s) in order to conceal the nature, type, and quality of item(s) being prescribed and/or provided; and (v) fabricated, false and misleading prescriptions for DME and/or orthotic devices, concealing the fact that the DME and/or orthotic devices either were not prescribed as alleged, or were prescribed and supplied pursuant to a pre-determined, fraudulent protocol, whereby QBS Solutions paid kickbacks to No-fault Clinics to induce the No-fault Clinics to provide fraudulent and fabricated prescriptions for large amounts of substantially similar, medically unnecessary DME and/or orthotic devices.  All of foregoing was intended to manipulate the payment formulas under the No-fault Law in order to maximize the charges that QBS Solutions could submit to Plaintiff and other insurers under the No-fault Law.

22.     In carrying out the scheme to defraud, Defendants stole in excess of $136,300.00 from Plaintiff by submitting, causing to be submitted or facilitating the submission of fraudulent claims for persons who allegedly sustained injuries covered by the New York State Comprehensive Motor Vehicle Insurance Reparations Act, Ins. Law §§ 5101, *et seq*. (popularly known as the "No-fault Law").

## STATUTORY/REGULATORY SCHEME

23.     Pursuant to the No-fault Law, Plaintiff is required to pay, *inter alia*, for health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles or pedestrians, which arise from the use or operation of such motor vehicles in the State of New York.  Covered Persons can also assign these benefits to doctors and other properly licensed healthcare providers, including DME retailers, enabling them to bill insurance companies directly for their services.

24.     As alleged herein, Defendants exploited and continue to exploit this system by obtaining such assignments and billing Plaintiff for DME and/or orthotic devices that were never provided, not provided as billed or, if provided, were of inferior quality relative to what was represented to have been provided in the bills submitted to Plaintiff, and/or were otherwise medically unnecessary and provided pursuant to fraudulent prescriptions in conformity with a predetermined course of treatment in which virtually all Covered Persons received substantially similar DME and/or orthotic devices.  Exhibit "1" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiff to QBS Solutions for medical equipment and/or other services provided pursuant to fraudulent prescriptions based upon a predetermined course of treatment, irrespective of medical necessity.

25.     QBS Solutions is ostensibly a DME supply company that bills for medical supplies provided to, among others, individuals covered under the No-fault Law.  In exchange for its services, QBS Solutions accepted assignments of benefits from Covered Persons and submitted claims for payment to No-fault insurance carriers, in general, and to Plaintiff, in particular.

26.     In accordance with the No-fault Law and 11 N.Y.C.R.R. §§ 65 *et seq.*, QBS Solutions submitted bills for its claims to Plaintiff using the claim form prescribed by the New York State Department of Financial Services ("DFS," f/k/a the Department of Insurance), known as a "Verification of Treatment by Attending Physician or Other Provider of Health Service" or "NYS form NF-3" (hereinafter "NF-3"), or a substantially similar form.

27.     At all relevant times mentioned herein, pursuant to Section 403 of the New York State Insurance Law, the claim forms submitted to Plaintiff by QBS Solutions contained the following warning at the foot of the page:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime….

28.     At all relevant times mentioned herein, pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiff was (and is) required to promptly process claims within 30 days of receipt of proof of claim.

29.      At all relevant times mentioned herein, Section 5108 of the No-fault Law circumscribes the amount that a licensed healthcare provider or other authorized person, such as a DME provider, may recover for health service related expenses. Under this section, such persons are only entitled to reimbursement of necessary medically related expenses in accordance with the applicable fee schedules established by the Chairman of the Workers' Compensation Board and adopted by the Superintendent of the DFS.

30.     By Opinion Letter dated June 16, 2004, entitled "No-Fault Fees for Durable Medical Equipment," the New York State Insurance Department recognized the harm inflicted on insureds by inflated DME charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

31.     At all relevant times mentioned herein, pursuant to Ins. Law § 5108, the Superintendent of the DFS adopted, by promulgation of Regulation 83, the Workers' Compensation Board ("WCB") Fee Schedules for determining the maximum permissible

reimbursement amounts for which health care providers may charge for services provided to Covered Persons under the No-fault Law. 11 N.Y.C.R.R. § 68.1.

32.     At all relevant times mentioned herein, Regulation 83 did not adopt the Workers' Compensation Fee Schedules with respect to "workers' compensation claim forms, pre-authorization approval, time limitations within which health services must be performed, enhanced reimbursement for providers of certain designated services..."

33.     Effective October 6, 2004, the Department of Financial Services, through the Superintendent's promulgation of the 28th Amendment to Regulation 83 (11 N.Y.C.R.R. § 68 *et. seq.*), established a fee schedule for the reimbursement of durable medical equipment and medical supplies by adopting the New York State Medicaid fee schedules for durable medical equipment, medical/surgical supplies, orthopedic footwear, and orthotic and prosthetic appliances (hereinafter the "Fee Schedule"). 12 N.Y.C.R.R. § 442.2(a). (effective through June 7, 2021). The Fee Schedule was in effect at all dates of service mentioned herein.

34.     The 28th Amendment to Regulation 83 provided:

> [The] maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, orthopedic footwear and orthotic and prosthetic appliances is the fee payable for such equipment and supplies under the New York State Medicaid program at the time such equipment and supplies are provided. If the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, shall be the lesser of: (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or (2) the usual and customary price charged to the general public.

11 N.Y.C.R.R. § 68 (Appendix 17-C, Part F) (effective through July 10, 2007).

35.     Effective July 11, 2007, for DME and/or orthotic devices provided up to and including April 3, 2022, the WCB established a fee schedule for DME and orthotic devices by also

adopting the New York State Medicaid fee schedule for durable medical equipment, medical/surgical supplies, orthopedic footwear, and orthotic and prosthetic appliances. 12 N.Y.C.R.R. § 442.2(a) (effective through June 7, 2021).

36.    In view of the adoption by the WCB of the New York State Medicaid fee, on or about April 16, 2008, the DFS promulgated the 30th Amendment to Regulation 83, which repealed Part F of Appendix 17-C, since it was no longer needed due to the DFS' prior adoption of the WCB's fee schedule, which then included the Fee Schedule that was, and is, in effect at all relevant times mentioned herein.

37.    Accordingly, at all relevant times mentioned herein, providers of DME are entitled to reimbursement in the amounts set forth in the Fee Schedule.  At all relevant times mentioned herein, for with respect to items not listed on the Fee Schedule (hereinafter "Non-Fee Schedule" items), the provider is only entitled to reimbursement in an amount equal to the *lesser* of either: (i) the net acquisition cost of the medical equipment to the provider, plus 50%, or (ii) the usual and customary price charged to the public. 11 N.Y.C.R.R. § 68.1; 12 N.Y.C.R.R. § 442.2(a) (effective through June 7, 2021).

38.    By Board Bulletin Numbers 046-1408, dated May 24, 2021, and 046-1496, dated February 3, 2022, the Chair of the WCB delayed the implementation of amendments to 12 N.Y.C.R.R. §§ 442.2, 442.4 and 442.5, which was to become effective June 7, 2021, with the result that the Fee Schedule remained effective for Workers' Compensation and No-fault claims until the completion of Phase 2 of the WCB's implementation of its new electronic claims management system, OnBoard on April 4, 2022. New York Workers' Compensation Board Bulletin Nos. 046-1408 (May 24, 2021) (http://www.wcb.ny.gov/content/main/SubjectNos/sn046_1408.jsp), 046-1496 (Feb. 3, 2022) (http://www.wcb.ny.gov/content/main/SubjectNos/sn046_1496.jsp).

39.     At all relevant times mentioned herein, pursuant to Section 5108(c) of the No-fault Law, "no provider of health services . . . may demand or request any payment in addition to the charges authorized pursuant to this section."

40.     Moreover, to be eligible for reimbursement under the No-fault Law during all relevant times mentioned herein, all claims for reimbursement must include a description of the "full particulars of the nature and extent of the . . . treatment received," including DME. *See* 11 N.Y.C.R.R. § 65-1.1.

41.     At all relevant times mentioned herein, nearly each and every bill mailed to Plaintiff by Sofiev, through QBS Solutions, sought reimbursement in excess of the amounts authorized by the No-fault Law, by materially misrepresenting the DME and/or orthotic devices provided, if provided at all, as well as the cost, quality, and medical necessity of the billed-for DME and/or orthotic devices.  To the extent the DME and/or orthotic devices were provided at all, each item was a basic, low-quality piece of medical equipment for which the proper reimbursement amount, if reimbursable at all, was a mere fraction of the amount they charged Plaintiff, and/or was medically unnecessary because it was provided pursuant to a predetermined course of treatment, irrespective of medical need.

42.     At all times relevant herein, the Defendants exploited the No-fault Law through the utilization of various deceptive and identical billing tactics engineered to maximize the amount of reimbursement from insurers, in general, and Plaintiff, in particular, through the submission of fraudulent billing documents that misrepresented the nature, quality and cost of items that both are and are not listed on the relevant fee schedule ("Fee Schedule items" and "Non-Fee Schedule items," respectively) purportedly provided to Covered Persons.

43.     As set forth in the "Non-Fee Schedule Scheme to Defraud" below, Sofiev, through QBS Solutions, routinely submitted bills to Plaintiff for Non-Fee Schedule items wherein QBS Solutions misrepresented that (i) the DME and/or orthotic devices purportedly provided were reimbursable under the relevant Fee Schedule in existence at the time, when, in fact, QBS Solutions was utilizing codes that were not recognized by, or otherwise listed in, the relevant Fee Schedule ("phantom codes"); (ii) the charges reflected on QBS Solutions' bills were in accordance with 12 N.Y.C.R.R. § 442.2, when, in fact, the charges were grossly inflated; and/or (iii) the DME and/or orthotic devices purportedly provided were reimbursable pursuant to the Fee Schedule, when they were not.  In doing so, Sofiev, as described in the "Non-Fee Schedule Scheme to Defraud" section below, through QBS Solutions, deliberately misrepresented the amounts that they were entitled to receive under the No-fault Law.

44.     In addition, as set forth in the "Fee Schedule Scheme to Defraud" section below, Sofiev, through QBS Solutions, also routinely submitted fraudulent bills to Plaintiff for DME and/or orthotic devices that were never provided, including, but not limited to, expensive custom-fit DME and/or orthotic devices.

45.     On information and belief, QBS Solutions and Wholesalers alike were created for the purpose of participating in the fraudulent billing of insurance companies under the No-fault Law.

46.     On information and belief, every aspect of Defendants' fraudulent scheme was motivated by money, without regard to the grave harm inflicted on the public at large by the Defendants, who, to the extent that they provided any DME and/or orthotic devices at all, provided Covered Persons with inferior, low-quality items, or items that directly contravened the treatment plan indicated by the treating physicians, potentially compromising patients' health.

47.     The duration, scope and nature of the Defendants' illegal conduct bring this case well within the realm of criminal conduct to which the Racketeer Influenced and Corrupt Organizations Act ("RICO") applies. Defendants did not engage in sporadic acts of fraud—although that would be troubling enough—rather, they adopted a business plan and used it to participate in systematic patterns of racketeering activity. Every facet of Defendants' operations, from securing fraudulent prescriptions for DME and/or orthotic devices pursuant to a predetermined course of treatment, to obtaining inflated wholesale invoices for inexpensive, low quality items, to generating bills that contained codes not recognized under the Fee Schedule in existence at the time, or that misrepresented the nature, quality, and cost of DME and/or orthotic devices purportedly provided, was carried out for the purpose of committing fraud.

48.     This lawsuit seeks to, among other things, enforce the plain language of the No-fault Law and implementing regulations, as well as its underlying public policy, which limits reimbursement of No-fault benefits to legitimate insurance claims for DME and/or orthotic devices. In doing so, Plaintiff seeks compensatory damages and declaratory relief that Plaintiff is not required to pay any of the Retail Defendants' No-fault claims because Sofiev, through QBS Solutions, submitted (1) false and fraudulent insurance claims to Plaintiff deliberately misrepresenting the amounts they were entitled to be reimbursed; and/or (2) false and fraudulent insurance claims to Plaintiff for DME and/or orthotic devices the Retail Defendants never actually supplied to Covered Persons. Such claims continue to be submitted by and/or in the name of QBS Solutions and are, or can be, the subject of No-fault collection actions and/or arbitrations to recover benefits, and thus, constitute a continuing harm to Plaintiff.

49.     By way of example and not limitation, Exhibit "2" in the accompanying Compendium of Exhibits is a spreadsheet listing in excess of $77,600.00 in unpaid No-fault claims

that form the basis of Plaintiff's request for declaratory relief. Said spreadsheet is grouped by claim number, date of service and the amount billed.

## NATURE OF THE ACTION

50.     This action is brought pursuant to:

i)      The United States Racketeer Influenced and Corrupt Organizations Act ("RICO"); 18 U.S.C. §§ 1961, 1962(c) and 1964(c);

ii)     New York State common law; and

iii)    the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

## NATURE OF RELIEF SOUGHT

51.     Pursuant to 18 U.S.C. § 1964(c), Plaintiff seeks treble damages, which it sustained as a result of the Defendants' schemes to defraud and acts of mail fraud in connection with their use of the facilities of the No-fault system to fraudulently obtain payments from Plaintiff for DME and/or orthotic devices they allegedly provided to individuals covered by Plaintiff under New York State's No-fault Law.

52.     Plaintiff further seeks a judgment declaring that they are under no obligation to pay any of QBS Solutions' unpaid No-fault claims because:

i)      The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiff to obtain reimbursement far in excess of the maximum permissible amount they could submit to Plaintiff; and

ii)     The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiff seeking reimbursement for DME and/or orthotic devices that they never supplied to Covered Persons.

53.     As a result of Defendants' actions alleged herein, Plaintiff weas defrauded of an amount in excess of $136,300.00, the exact amount to be determined at trial, in payments which

Defendants received for fraudulently billing Plaintiff for DME and/or orthotic devices that were never provided or, if provided, not provided as billed and/or provided pursuant to fraudulent prescriptions in accordance with a predetermined course of treatment, irrespective of medical need.

## THE PARTIES

### A.     Plaintiff

54.     Plaintiff American Transit Insurance Company is a corporation duly organized and existing under the laws of the State of New York, having its principal place of business in Brooklyn, New York.

55.     Plaintiff is duly organized and licensed to engage in the writing of automobile insurance policies in the State of New York and provide automobile insurance coverage to their policyholders under and in accordance with New York State law.

### B.     Retail Defendants

56.     Joseph Sofiev ("Sofiev") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer QBS Solutions Inc. and, at all times relevant herein, operated, managed, and/or controlled its activities.

57.     QBS Solutions Inc. ("QBS Solutions") was incorporated on or about February 28, 2018, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 9106 101st Avenue, Ozone Park, NY 11416. QBS Solutions is operated, managed, and/or controlled by Defendant Sofiev and submitted fraudulent claims to Plaintiff seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

**C.     The John Doe Defendants**

58.     On information and belief, John Does 1 through 5 are the principals, officers, and/or directors of the ABC Corporations 1 through 5.  On information and belief, John Doe Defendants 1 through 5, through the ABC Corporations 1 through 5, entered into kickback and/or other financial compensation agreements with QBS Solutions to provide inexpensive DME and/or orthotic devices and fraudulent wholesale invoices that enabled QBS Solutions to fraudulently bill Plaintiff.  These individuals will be added as defendants when their names and the extent of their participation become known through discovery.

**D.     The ABC Corporations**

59.     On information and belief, the ABC Corporations 1 through 5 are additional corporations that purport to be wholesale DME supply companies that supply QBS Solutions with basic, inexpensive DME and/or orthotic devices, coupled with fraudulent wholesale invoices that greatly inflate the true cost and/or quantity of the DME and/or orthotic devices actually provided to QBS Solutions.  These wholesale invoices: (i) misrepresent the wholesale prices for the DME and/or orthotic devices purportedly provided; and (ii) intentionally omit any model number, make, manufacturer or other identifiable information so that QBS Solutions can, in turn, submit the fraudulent wholesale invoices to insurers, including Plaintiff, in support of their fraudulent claims for reimbursement.  These ABC Corporations 1 through 5 will be added as defendants when their names and the full extent of their participation become known through discovery.

**JURISDICTION AND VENUE**

60.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.* because they arise under the laws of the United States.

61.     This Court also has jurisdiction over the subject matter of this action under 28 U.S.C. § l332 because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

62.     This Court also has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a).

63.     Pursuant to 18 U.S.C. § 1965, 28 U.S.C. § 1367 and New York CPLR § 302(a), this Court has personal jurisdiction over any non-domiciliary defendant.

64.     Venue lies in this District Court under the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b) as the Eastern District of New York is the district where one or more the Defendants reside and because this is the district where a substantial amount of the activities forming the basis of the Complaint occurred.

## FACTUAL BACKGROUND AND ALLEGATIONS
## APPLICABLE TO ALL CAUSES OF ACTION

65.     Plaintiff underwrites automobile insurance in New York State.

66.     As set forth in the Statutory/Regulatory Scheme section above, pursuant to the No-fault Law, Plaintiff is required to pay for, *inter alia*, health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles and pedestrians that arise from the use or operation of such motor vehicles in the State of New York.

67.     QBS Solutions is ostensibly a DME supply company that bills for medical supplies provided to, among others, individuals covered under the No-fault Law.  In exchange for its services, QBS Solutions accepts assignments of benefits from the Covered Persons covered under the No-fault Law and submit claims for payment to No-fault insurance carriers, in general, and to Plaintiff, in particular.

68.     To process and verify the claims submitted by QBS Solutions, Plaintiff required, and QBS Solutions submitted, prescriptions and other documents relating to the DME and/or orthotic devices allegedly supplied to Covered Persons for which QBS Solutions was seeking reimbursement from Plaintiff.

69.     In nearly all instances, the prescriptions submitted in support of QBS Solutions' claims for reimbursement were fraudulent, fabricated, and/or issued pursuant to a pre-determined treatment protocol, regardless of medical necessity.

70.     In certain instances, QBS Solutions submitted wholesale invoices to Plaintiff in support of their claims for reimbursement, which reflected inflated prices well in excess of what QBS Solutions actually paid, if anything, for the DME and/or orthotic devices purportedly purchased from the Wholesaler.

71.     Pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiff is required to promptly process QBS Solutions' claims within 30 days of receipt of proof of claim.

72.     To fulfill its obligation to promptly process claims, Plaintiff justifiably relied upon the bills and documentation submitted by QBS Solutions in support of their claims, and paid QBS Solutions based on the representations and information contained in the bills and documentation that Defendants mailed to Plaintiff.

73.     At all relevant times mentioned herein, the No-fault Law provides that the maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies and orthotic and prosthetic appliances is the fee payable for such equipment and supplies under the relevant fee schedule established by the Worker's Compensation Board, as adopted by the Superintendent of the DFS. N.Y. Ins. Law § 5108; 11 N.Y.C.R.R. 68.1(a).

74.     At all relevant times mentioned herein, for DME and orthotic devices, the Worker's Compensation Board has adopted the fee schedule set by the New York State Medicaid program at the time such equipment and supplies are provided. 12 N.Y.C.R.R. § 442.2 (effective through June 7, 2021).

75.     At all relevant times mentioned herein, with respect to DME and/or medical supplies for which the New York State Medicaid program has not established a fee ("Non-Fee Schedule Items"), the regulation provides that the fee payable shall be the lesser of:

>    (1)   the acquisition cost (*i.e.*, the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50 percent; or
>
>    (2)   the usual and customary price charged to the general public.

12 N.Y.C.R.R § 442.2 (effective through June 7, 2021).

76.     At all relevant times mentioned herein, as a result of the WCB's delay of implementation of amendments to 12 N.Y.C.R.R. § 442.2, intended to become effective June 7, 2021, the fee schedule set by the New York State Medicaid Program and adopted by the WCB continued to set the maximum permissible charge for DME and/or orthotic devices dispensed through April 3, 2022. New York Workers' Compensation Board Bulletin Nos. 046-1408 (May 24, 2021), 046-1496 (Feb. 3, 2022).

77.     QBS Solutions was created as the centerpiece of an elaborate scheme to fraudulently bill No-fault insurance carriers for DME and/or orthotic devices that were never provided, were not provided as billed or, if provided, were either of inferior quality relative to what was included in the bills submitted to Plaintiff, and/or were otherwise medically unnecessary and provided pursuant to a predetermined course of treatment in which virtually all Covered Persons received the same or similar battery of DME and/or orthotic devices.

78.     The DME and/or orthotic devices that QBS Solutions purported to provide, and for which they billed Plaintiff, seldom varied from patient-to-patient over a given period of time and also did not change based on any differences in the patients' condition, age, complaints, type of accident, or nature of alleged injury.  Instead, Sofiev, through QBS Solutions, created a billing apparatus implementing a pre-determined treatment protocol that was designed to drain the maximum amount of dollars from insurance companies for each and every patient, including those who required little or no DME at all.

79.     Sofiev created and controlled QBS Solutions, as part of a well-organized illegal enterprise that engaged in systematic and pervasive fraudulent practices that distinguished it from legitimate providers of DME and/or orthotic devices.  The components of this enterprise followed practices that were part of a racketeering scheme dictated by Sofiev, including, but not limited to, the one of more of the following practices:

- Unlike legitimate retail DME companies, Sofiev, through QBS Solutions, misrepresented the nature, quality and cost of DME and/or orthotic devices purportedly provided to Covered Persons;

- Unlike legitimate retail DME companies, Sofiev, through QBS Solutions, submitted bills to Plaintiff misrepresenting the amounts they were entitled to be reimbursed under the No-fault Law;

- Unlike legitimate retail DME companies, Sofiev, through QBS Solutions, submitted bills to Plaintiff for DME and/or orthotic devices that were never provided to Covered Persons;

- Unlike legitimate retail DME companies, Sofiev, through QBS Solutions, misrepresented the wholesale costs and/or usual and customary price of the Non-fee Schedule items purportedly supplied to Covered Persons;

- Unlike legitimate retail DME companies, Sofiev, through QBS Solutions, submitted wholesale invoices to Plaintiff as part of their proof of claim, which systematically failed to provide a meaningful description of the DME and/or orthotic devices purportedly provided (*i.e.*, make and model) and/or additional information that is necessary to determine whether the charges submitted are legitimate;

- Unlike legitimate retail DME companies, Sofiev, through QBS Solutions, submitted wholesale invoices to Plaintiff containing generic item

descriptions, concealing the manufacturer, make, model, size, and quality of the DME and/or orthotic devices purportedly supplied;

- Unlike legitimate retail DME companies, Sofiev, through QBS Solutions, submitted bills to Plaintiff reflecting prices far in excess of those actually paid, concealing that the items actually supplied were far less expensive than the amounts indicated in the wholesale invoice for any particular item;

- Unlike legitimate retail DME companies, Sofiev, through QBS Solutions, submitted prescriptions, bills, and delivery receipts to Plaintiff for DME and/or orthotic devices that generically described the item(s) so as to conceal the type of item(s) being prescribed and/or provided;

- Unlike legitimate retail DME companies, Sofiev, through QBS Solutions, concealed the fact that the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol pursuant to a kickback or other financial arrangement with No-fault Clinics;

- Unlike legitimate retail DME companies, Sofiev, through QBS Solutions, concealed the fact that the prescription forms submitted in support of their claims for reimbursement were fabricated and/or fraudulently altered in order to maximize reimbursement regardless of medical necessity;

- Unlike legitimate retail DME companies, Sofiev, through QBS Solutions, and/or those acting under their direction and control, had agreements and/or understandings as to what generic DME and/or orthotic devices would be prescribed by the No-fault Clinics;

- Unlike legitimate retail DME companies, Sofiev, through QBS Solutions, arranged for the generic language on the prescription forms in order to unilaterally determine the DME and/or orthotic devices to be provided to patients and billed to insurers, in general, and Plaintiff in particular;

- Unlike legitimate retail DME companies, Sofiev, through Solutions, arranged to have prescriptions for DME and/or orthotic devices delivered to them directly by the No-fault Clinics, rather than allowing the patients to select their DME supply company;

- Unlike legitimate retail DME companies, Sofiev, through QBS Solutions, entered into illicit relationships with the Wholesale Defendants, which, in exchange for kickbacks and/or a fee, provided QBS Solutions with wholesale invoices that fraudulently inflated the price, quantity and/or item(s) provided, with the payments relating to such wholesale invoices, in some instances, actually serving as the vehicle through which Defendants laundered the money back to Sofiev through the use of check cashing establishments.

80.    In these and numerous other ways, Defendants sought to deceive Plaintiff into paying fraudulent claims that typically exceeded thousands of dollars per Covered Person.

81.     The members of the QBS Solutions enterprise alleged herein played well-defined and essential roles in the Defendants' scheme to defraud and in directing the affairs of the enterprises.  By way of example and not limitation, in furtherance of their scheme to defraud, Sofiev engaged in one or more the following:

- Entered into kickback or other financial arrangements with No-fault Clinics, not named as defendants in this action, to (i) ensure that their HCPs prescribed large amounts of virtually identical DME and/or orthotic devices to their patient population, and/or (ii) fabricate and/or fraudulently alter prescriptions issued by the HCPs, in order to conform the prescriptions to a predetermined course of treatment, irrespective of medical necessity;

- Entered into kickback or other financial arrangements with No-fault Clinics to ensure that the prescriptions provided were sufficiently generic so that the nature, quality, and cost of any DME and/or orthotic device could not be verified based on the description of the prescribed item alone;

- Entered into kickback or other financial arrangements with No-fault Clinics to ensure that the prescriptions provided were sufficiently generic so that QBS Solutions could unilaterally determine the DME and/or orthotic devices to be provided to patients and billed to insurers, in general, and Plaintiff in particular;

- Entered into kickback or other financial arrangements with one or more of the Wholesale Defendants so that they would provide inexpensive DME and/or orthotic devices, along with fraudulent wholesale invoices that grossly inflated the amounts QBS Solutions paid for the DME and/or orthotic devices;

- Submitted or caused to be submitted, on behalf of QBS Solutions, numerous fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to many Covered Persons;

- Submitted or caused to be submitted, on behalf of QBS Solutions, prescription forms in support of requests for payment for DME and/or orthotic devices, which Sofiev knew to be fabricated and/or fraudulently altered;

- Prepared or caused to be prepared fraudulent bills to be mailed to Plaintiff; and/or

- Mailed or caused those acting under their direction to mail bogus claims to Plaintiff, knowing that they contained materially false and misleading information.

82.     By way of further example and not limitation, in furtherance of their scheme to defraud, the Wholesale Owners, through the Defendant Wholesalers:

- Entered into kickback arrangements with Sofiev, through QBS Solutions, to provide inexpensive DME and/or orthotic devices, coupled with wholesale invoices that grossly inflated the cost and/or quantity of the DME and/or orthotic devices reflected therein;

- Entered into kickback arrangements with Sofiev, through QBS Solutions, to provide wholesale invoices that were sufficiently generic so that the nature, quality, and cost of any DME and/or orthotic device could not be verified based on the description of the item alone; and/or

- Prepared or caused to be prepared fraudulent wholesale invoices and sent them to QBS Solutions, knowing that QBS Solutions, in turn, would submit them to insurers in support of fraudulent claims for reimbursement.

83.     By way of further example, in furtherance of the scheme to defraud alleged herein, the Defendant Wholesalers:

- Provided inexpensive DME and/or orthotic devices, along with fraudulent wholesale invoices that grossly inflated the amounts QBS Solutions paid for the DME and/or orthotic devices;

- Provided generic, non-descript wholesale invoices that deliberately omitted the make, model and/or manufacturer of the DME and/or orthotic devices to ensure that the nature, quality, and cost of any DME and/or orthotic device could not be verified based on the description of the item alone;

- Provided the essential means through which Sofiev was able to submit fraudulent bills to Plaintiff for reimbursement of Non-Fee Schedule DME and/or orthotic devices under the No-fault Law;

- Knew or should have known that the inflated costs and/or quantities of the DME and/or orthotic devices reflected in the wholesale invoices they provided were materially misrepresented in the bills submitted by Sofiev, through QBS Solutions, to insurers;

- Knew or should have known that the generic, non-descript wholesale invoices they provided were used to materially misrepresent the nature, cost, and quality of the DME and/or orthotic devices reflected in the bills submitted by Sofiev, through QBS Solutions, to insurers;

- Converted the checks they received from QBS Solutions to cash and returned to a portion of the profits of the scheme through kickbacks or other financial compensation;

- Were oftentimes shell corporations, with no discernable, formal corporate structure or physical office space; and/or

- Claimed to conduct their daily operations from locations with no signage or that were shuttered with no indication that any business was conducted at that location.

84.     At all relevant times mentioned herein, the Wholesale Owners, either directly or through others acting under and pursuant to their direction, instruction, and control, caused fraudulent wholesale invoices to be provided to QBS Solutions, which they knew or should have known would be used by QBS Solutions in furtherance of the scheme to defraud alleged herein.

85.     At all relevant times mentioned herein, the fraudulent wholesale invoices issued by the Wholesale Defendants provided the essential means by which Sofiev, through QBS Solutions, was able to further the scheme to defraud alleged in this Complaint.

86.     At all relevant times mentioned herein, the Wholesale Owners knew or should have known that the fraudulent wholesale invoices that were provided to QBS Solutions through the Wholesalers would be used by QBS Solutions to obtain payment from insurers, in general, and Plaintiff, in particular, in connection with fraudulent claims.

87.     At all relevant times mentioned herein, Sofiev knew that the wholesale invoices provided by the Wholesale Defendants were fraudulent in that they misstated the price, quantity, and quality of the DME and/or orthotic devices purportedly sold to QBS Solutions.

88.     At all relevant times mentioned herein, Sofiev, through QBS Solutions, directly or through others acting under and pursuant to their direction, instruction, and control, submitted or caused to be submitted the fraudulent wholesale invoices provided by the Wholesale Defendants to Plaintiff, in furtherance of the scheme to defraud alleged herein, to obtain payment in connection with fraudulent claims.

89.     At all relevant times mentioned herein, Sofiev and Wholesale Defendants, acting in concert with each other, participated in, conducted, controlled, conspired together, aided and

abetted and furthered the fraudulent schemes through a common course of conduct and purpose, which was to defraud insurers, in general, and Plaintiff, in particular, of money.

## THE MECHANICS OF THE SCHEME TO DEFRAUD

90.     Beginning in February 2018 and continuing until the present day, Defendants and others not named in the Complaint have engaged in systematic fraudulent billing schemes based upon the alleged provision of DME and/or orthotic devices to Covered Persons.

91.     Sofiev incorporated, owned and/or controlled QBS Solutions for the purpose of defrauding insurers, in general, and Plaintiff, in particular.

92.     QBS Solutions, through Sofiev, engaged in a scheme to defraud, wherein Sofiev: (i) paid kickbacks to the No-fault Clinics in exchange for prescriptions of DME and/or orthotic devices; (ii) obtained prescriptions that were provided pursuant to a predetermined course of treatment, without regard to medical necessity; (iii) obtained and submitted to insurers, in general, and Plaintiff, in particular, prescriptions which they knew to be fabricated and/or fraudulently altered; (iv) obtained fraudulently inflated wholesale invoices from one or more Wholesale Defendants that QBS Solutions, in turn, would use to substantiate bogus claims for reimbursement of No-fault benefits and/or purchased counterfeit DME and/or orthotic devices from non-party wholesalers; (v) arranged for the No-fault Clinics to have assignments of benefits and acknowledgement of delivery receipt forms signed by Covered Persons on their behalf to ensure that they had all of the documents necessary to submit claims to insurers, in general, and Plaintiff, in particular; and (vi) systematically submitted bills to insurers, in general, and Plaintiff, in particular, for DME and/or orthotic devices that were purportedly provided to Covered Persons based on medical necessity when, in fact, Sofiev, through QBS Solutions, determined the DME

that would be prescribed by the No-fault Clinics, with virtually every Covered Person receiving a substantially similar battery of DME and/or orthotic devices.

93.     With QBS Solutions in place, Defendants carried out their scheme to fraudulently bill insurers, in general, and Plaintiff, in particular, for expensive DME and/or orthotic devices that were never provided, or if provided, were provided pursuant to fraudulent prescriptions based upon a pre-determined treatment protocol, irrespective of medical necessity, and further, were inexpensive items of inferior quality that cost a fraction of the amounts that Defendants materially misrepresented in their fraudulent bill submissions to Plaintiff.

94.     Regardless of whether a Covered Person was seen by a doctor on the date of the initial office visit at any of the unnamed No-fault Clinics operating in the New York metropolitan area, a Covered Person's initial office consultation would automatically trigger a series of internal practices and procedures in which the No-fault Clinics, in exchange for kickbacks and/or other financial compensation agreements with QBS Solutions, would issue a prescription for a standard battery of DME and/or orthotic devices, pursuant to a standard protocol or predetermined course of treatment and regardless of whether such items were medically necessary.

95.     Such prescriptions are issued for virtually every Covered Person, regardless of factors such as their age, height, weight, prior medical history, position in the vehicle and/or purported involvement in an accident.

96.     As part of the scheme to defraud described herein, pursuant to kickbacks or other financial compensation agreements with QBS Solutions, the No-fault Clinics arranged for the fraudulent prescriptions to be issued to QBS Solutions by: (i) causing their Health Care Practitioners ("HCPs") to write DME prescriptions in accordance with a pre-determined protocol; (ii) fabricating and/or falsifying DME prescriptions by altering the prescriptions, and filling in the

prescription with expensive and unnecessary DME and/or orthotic devices; and/or (iii) ensuring that the prescriptions were sufficiently generic so that the nature, quality and cost of any DME and/or orthotic device could not be verified based on the description of the prescribed item alone. In numerous instances, not only did Covered Persons receive the same or similar battery of DME and/or orthotic devices, but oftentimes two or more Covered Persons that were purportedly injured in the same accident would receive identical or virtually identical prescriptions for DME and/or orthotic devices despite being different ages, in different physical condition, differently positioned in the same motor vehicle accident, and possessing differing medical needs.

97.    In furtherance of the scheme to defraud alleged herein, pursuant to the fraudulent protocol of treatment, the HCPs at the No-fault Clinics routinely prescribed identical DME and/or orthotic devices to two or more Covered Persons who were involved in the same accident.  By way of example and not limitation:

- On September 29, 2018, Covered Persons K.A., claim number 1039993-01; and J.R., claim number 1039993-03 were involved in the same automobile accident, but were in different physical conditions and experienced the impact from different locations in the vehicle, yet received the same DME and/or orthotic devices despite their injuries being almost certainly different:

| Covered Person | Date of Service | DME Billed For | Billing Code | Amount Billed |
|---|---|---|---|---|
| | | 1. Cervical Pillow | E0190 | $22.04 |
| | | 2. Back Massager | E1399 | $139.50 |
| | | 3. Cervical Collar | L0172 | $75.00 |
| K.A. | 10/30/2018 | 4. LSO | L0627 | $322.98 |

| Covered Person | Date of Service | DME Billed For | Billing Code | Amount Billed |
|---|---|---|---|---|
| | | 1. Cervical Pillow | E0190 | $22.04 |
| | | 2. Back Massager | E1399 | $139.50 |
| | | 3. Cervical Collar | L0172 | $75.00 |
| J.R. | 10/26/2018 | 4. LSO | L0627 | $322.98 |

- On April 10, 2018, Covered Persons B.R., claim number 1025401-02; R.M., claim number 1025401-07; and W.R., claim number 1025401-08, were involved in the same automobile accident, but were in different physical conditions and experienced the impact from different locations in the vehicle, yet received the same DME and/or orthotic devices despite their injuries being almost certainly different:

| Covered Person | Date of Service | DME Billed For | Billing Code | Amount Billed |
|---|---|---|---|---|
| | | 1. Water Circulating Unit w/ Pad | E0236 | $180.00 |
| | | 2. Foam Mattress | E0272 | $155.52 |
| | | 3. Bed Board | E0273 | $51.00 |
| | | 4. Back Massager | E1399 | $139.50 |
| B.R. | 5/10/2018 | 5. LSO | L0627 | $322.98 |

| Covered Person | Date of Service | DME Billed For | Billing Code | Amount Billed |
|---|---|---|---|---|
| | | 1. Water Circulating Unit w/ Pad | E0236 | $180.00 |
| | | 2. Foam Mattress | E0272 | $155.52 |
| | | 3. Bed Board | E0273 | $51.00 |
| | | 4. Back Massager | E1399 | $139.50 |
| R.M. | 4/19/2018 | 5. LSO | L0627 | $322.98 |

| Covered Person | Date of Service | DME Billed For | Billing Code | Amount Billed |
|---|---|---|---|---|
| | | 1. Water Circulating Unit w/ Pad | E0236 | $180.00 |
| | | 2. Foam Mattress | E0272 | $155.52 |
| | | 3. Bed Board | E0273 | $51.00 |
| | | 4. Back Massager | E1399 | $139.50 |
| W.R. | 4/19/2018 | 5. LSO | L0627 | $322.98 |

- On August 5, 2018, Covered Persons J.T.F.; claim number 1035779-02; and O.C.J., claim number 1035779-03, were involved in the same automobile accident, but were in different physical conditions and experienced the impact from different locations in the vehicle, yet received the same DME and/or orthotic devices despite their injuries being almost certainly different:

| Covered Person | Date of Service | DME Billed For | Billing Code | Amount Billed |
|---|---|---|---|---|
| | | 1. Cervical Pillow | E0190 | $22.04 |
| | | 2. Back Massager | E1399 | $139.50 |
| | | 3. Cervical Collar | L0172 | $75.00 |
| J.T.F. | 8/29/2018 | 4. LSO | L0627 | $322.98 |

| Covered Person | Date of Service | DME Billed For | Billing Code | Amount Billed |
|---|---|---|---|---|
| | | 1. Cervical Pillow | E0190 | $22.04 |
| | | 2. Back Massager | E1399 | $139.50 |
| | | 3. Cervical Collar | L0172 | $75.00 |
| O.C.J. | 8/23/2018 | 4. LSO | L0627 | $322.98 |

98.     In furtherance of the predetermined fraudulent protocol of treatment, in numerous instances, the DME and/or orthotic devices prescribed were not documented in the initial examination report or a follow-up examination report of the HCP at the No-fault Clinics where ethe Covered Persons were treated.  To the extent that any of the medical records did identify the DME and/or orthotic devices purportedly prescribed, the records did not explain the medical necessity for the DME and/or orthotic devices, did not identity or reference all of the DME and/or orthotic devices listed on the prescriptions, and in some instances, identified DME and/or orthotic devices that was not included on the prescription issued by the HCPs.  In addition, on many occasions, the prescriptions for DME and/or orthotic devices, the prescriptions purportedly issued by the HCPs were often issued on dates that the Covered Persons did not treat with the HCPs.  By way of example and not limitation:

- On July 30, 2018, Covered Person F.G., claim number 1035593-04, was seen for an initial examination at a No-fault Clinic located at 4310 Church Avenue, Floor 1, Brooklyn, New York. On November 29, 2018, Covered Person F.G. was seen for a follow up examination. Both the initial and follow up reports made no mention of prescription of or recommendation for DME and/or orthotic devices. Notwithstanding, QBS Solutions submitted a bill with a prescription purportedly from the HCP prescribing the following Fraudulent Equipment:

| Covered Person | Prescription Date | DME Prescribed | Billing Code | Amount Billed |
|---|---|---|---|---|
| F.G. | 8/27/2018 | 1. LSO with APL Control Fitted | L0637 | $844.13 |
| | | 2. Lumbar Cushion | LE0190 | $22.04 |

- On September 25, 2018, Covered Person D.D., claim number 1040374-01, was seen for an initial examination at a No-fault Clinic located at 9016 Sutphin Blvd, Jamaica, New York. On October 30, 2018, November 29, 2018, and January 29, 2019, Covered Person D.D. was seen for a follow-up examinations. Both the initial and follow up reports made no mention of prescription of or recommendation for DME and/or orthotic devices. Notwithstanding, QBS Solutions submitted two bills with prescriptions purportedly from the HCP prescribing the following Fraudulent Equipment:

| Covered Person | Prescription Date | DME Prescribed | Billing Code | Amount Billed |
|---|---|---|---|---|
| D.D. | 11/20/2018 | Shoulder Elbow Wrist Hand Orthosis | L3960 | $372.50 |

| Covered Person | Prescription Date | DME Prescribed | Billing Code | Amount Billed |
|---|---|---|---|---|
| D.D. | 12/6/2018 | Knee Orthosis Rigid Adjust. Custom Fitted | L1832 | $607.55 |

- On March 5, 2018, Covered Person J.G., claim number 1022232-02, was seen for an initial examination at a No-fault Clinic located at 4226 Third Avenue, Suite 1, Bronx, NY and the initial examination report and treatment notes running through and beyond the date of the prescription made no mention of prescription of or recommendation for DME and/or orthotic devices. Notwithstanding, QBS Solutions submitted a bill with a prescription purportedly from the HCP prescribing the following Fraudulent Equipment:

| Covered Person | Prescription Date | DME Prescribed | Billing Code | Amount Billed |
|---|---|---|---|---|
| J.G. | 4/29/2018 | Cervical Traction with Pump | E0855 | $502.63 |

32

- On February 15, 2018, Covered Person T.M., claim number 1020864-02, was seen for an initial examination at a No-fault Clinic located at 86-01 101st Avenue, Ozone Park, New York, and the initial examination report and treatment notes running through and beyond the date of the prescription made no mention of any prescription or recommendation for DME and/or orthotic devices.  Notwithstanding, QBS Solutions submitted a bill with a prescription purportedly from the HCP prescribing the following Fraudulent Equipment:

| Covered Person | Prescription Date | DME Prescribed | Billing Code | Amount Billed |
|---|---|---|---|---|
| T.M. | 4/27/2018 | LSO with APL Control Fitted | L0637 | $844.13 |

- On February 21, 2018, Covered Person A.R., claim number 1019827-01, was seen for an initial examination at a No-fault Clinic located at 145 East 98th Street, Brooklyn, New York on February 21, 2018, and a follow-up examination on May 31, 2018, and neither the initial examination report nor follow-up examination report made mention of any prescription or recommendation for DME and/or orthotic devices. Notwithstanding, QBS Solutions submitted a bill with a prescription purportedly from the HCP prescribing the following Fraudulent Equipment:

| Covered Person | Prescription Date | DME Prescribed | Billing Code | Amount Billed |
|---|---|---|---|---|
| A.R. | 5/1/2018 | LSO with APL Control Fitted | L0637 | $844.13 |

99.     In furtherance of the fraudulent protocol of treatment, the specific DME and/or orthotic devices prescribed often contradicted the purported treatment plan of the HCPs.

100.     By way of example and not limitation, several Covered Persons were prescribed DME and/or orthotic devices that were designed to decrease and/or restrict the Covered Persons' mobility such as custom fitted LSO.  At the same time, the HCPs, were also prescribed physical therapy treatments designed to increase the Covered Persons' mobility. Representative claims where Covered Persons were provided with DME and/or orthotic device prescription designed to decrease mobility, while at the same time were actively receiving physical therapy treatments designed to promote mobility include: Covered Persons M.A.S., claim number 1012360-01; A.R.,

claim number 1019827-01; M.S., claim number 1025972-02; O.C.J., claim number 1035779-03; and D.D., claim number 1040374-01.

101.    On information and belief, the DME and/or orthotic devices restricting the Covered Persons movement completely contravenes the physical therapy treatments that the Covered Persons were also prescribed.

102.    In furtherance of the scheme to defraud alleged herein, the No-fault Clinics did not provide the Covered Persons directly with the prescriptions for DME and/or orthotic devices. Instead, these prescriptions were given directly to QBS Solutions to eliminate the possibility that the Covered Person(s) would fill the prescription(s) with a legitimate retailer of DME and/or orthotic devices.

103.    In addition to arranging for fraudulent prescriptions, in exchange for kickbacks and/or other financial compensation agreements with QBS Solutions, one or more No-fault Clinics operating in the New York metropolitan area often directed their HCPs to prescribe DME and/or orthotic devices that are not included in the Fee Schedule, such as bed boards, car seats, EMS Units, infrared heat lamps, massagers and whirlpools; and ensured that the prescriptions issued were generic and non-descript, omitting any detailed description of the items to be supplied to the Covered Persons.

104.    Similarly, as part of the kickback and/or other financial compensation agreements with the No-fault Clinics, the No-fault Clinics routinely provided QBS Solutions with generic, non-descript prescriptions for certain Fee Schedule Items, such as back braces, knee braces, shoulder braces, ankle braces, cervical traction units, cervical collars, and lumbar cushions, which QBS Solutions then used to unilaterally determine the DME provided to Covered Persons in purported fulfillment of the generic prescriptions, in order to bill for the most expensive type of

DME and/or orthotic device and maximize reimbursement from insurers, in general, and Plaintiff, in particular.

105.    By submitting a generic, non-descript prescription, devoid of any detail, in support of their claims for reimbursement, QBS Solutions was provided the means through which they misrepresented the nature, quality and cost of the DME and/or orthotic devices allegedly prescribed and provided to Covered Persons.

106.    By way of example and not limitation, on information and belief, when an HCP issued a prescription for a "cervical collar," the HCP intended for the Covered Person to receive a basic, inexpensive, circular foam collar, which carries a maximum reimbursement rate of $6.80 under the Fee Schedule, using HCPCS Code L0120, or a basic, prefabricated, two-piece semi-rigid thermoplastic foam collar, which carries a maximum reimbursement rate of $75.00, using HCPCS Code L0172. Instead, QBS Solutions would purport to provide a complex, expensive, hard plastic collar with multiple posts and with occipital and mandibular supports, by often billing for such items under HCPCS Code L0180, which carries a maximum reimbursement rate of $233.00.

107.    Furthermore, as part of the kickback or other financial compensation agreements with the No-fault Clinics and in furtherance of the scheme to defraud, on their first or second visit to the No-fault Clinic(s), the Covered Persons would be given a number of documents to complete and sign, including, but not limited to, assignment of benefit forms and one or more delivery receipts.

108.    In every instance, in furtherance of the scheme to defraud alleged herein, the delivery receipts describe the DME and/or orthotic devices in the same generic, non-descript manner as the prescriptions, claim forms, and wholesale invoices submitted by QBS Solutions in support of its claims for reimbursement.

109.    In furtherance of the scheme to defraud alleged herein, the delivery receipts submitted by QBS Solutions to Plaintiff routinely misrepresented the DME and/or orthotic devices provided.

110.    In furtherance of the scheme to defraud alleged herein, Sofiev, through QBS Solutions, purchased inexpensive DME and/or orthotic devices from wholesalers not named as defendants herein that were counterfeit or knockoffs of trademarked items made by other manufacturers. At all relevant times mentioned herein, QBS Solutions knew that it could purchase the counterfeit items at a fraction of the cost of the actual, trademarked items.

111.    In furtherance of the scheme to defraud alleged herein, QBS Solutions purchased the cheap DME and/or orthotic devices in bulk and routinely mispresented the nature, quality, and cost of the items in order to fraudulently obtain and maximize their reimbursement far in excess of the amounts they were entitled to receive under the No-fault Law.

112.    In other instances, in furtherance of the scheme to defraud alleged herein, QBS Solutions entered into agreements with one or more of the Wholesale Defendants whereby one or more Wholesale Defendants supplied QBS Solutions with invoices that were used to document false, inflated, and outrageous wholesale costs, which QBS Solutions then submitted to insurers, in general, and Plaintiff, in particular, as part of their proof of claim.

113.    On information and belief, in furtherance of the scheme to defraud alleged herein, the wholesale invoices provided by one or more Wholesale Defendants to QBS Solutions included artificially high prices that exceeded the actual wholesale price of the DME and/or orthotic devices reflected therein.

114.    To the extent QBS Solutions provided any DME and/or orthotic devices to Covered Persons, the DME and/or orthotic devices were inexpensive items that were materially misrepresented in the wholesale invoices received from one or more Wholesale Defendants.

115.    On information and belief, the wholesale invoices provided by the Wholesale Defendants to QBS Solutions reflected grossly inflated prices, in excess of 10 times the actual prices that QBS Solutions paid for the DME and/or orthotic devices when they were actually provided.

116.    On information and belief, in furtherance of the scheme to defraud alleged herein, each of the wholesale invoices provided by one or more Wholesale Defendants to QBS Solutions intentionally omitted the make, model, or manufacturer of the DME and/or orthotic devices reflected in the invoice, thereby ensuring that the nature and quality of the item that was supposedly provided could not be verified based on the wholesale invoice alone.

117.    In some instances, on information and belief, the DME and/or orthotic devices reflected in the wholesale invoices provided by one or more Wholesale Defendants to QBS Solutions were never actually provided to QBS Solutions; rather, one or more Wholesale Defendants created and provided the wholesale invoices to QBS Solutions to create the illusion of a sale.

118.    On information and belief, the wholesale invoices were provided to QBS Solutions to camouflage the conversion of QBS Solutions' checks payable to one or more Wholesale Defendants, which the Wholesale Defendants cashed at check cashing establishments or through other means.

119.    On information and belief, QBS Solutions would issue checks to one or more Wholesale Defendants for the full amount of the inflated wholesale invoice.  The Wholesale

Defendants would then convert the checks to cash through check cashing establishments, or by other means, and would return a substantial portion of the money to QBS Solutions, keeping a portion of the profits of the scheme for themselves.

120.    On information and belief, in furtherance of the scheme to defraud alleged herein, QBS Solutions requested that one or more Wholesale Defendants have their checks cashed on their corporate accounts to fraudulently demonstrate to insurers, such as Plaintiff, that they paid for the wholesale items when, in fact, they did not.

121.    In furtherance of the scheme to defraud alleged herein, QBS Solutions routinely submitted fraudulent documents, including, but not limited to, claim forms, prescriptions, delivery receipts, and wholesale invoices that materially misrepresented the nature, quality, and cost of the DME and/or orthotic devices purportedly provided to Covered Persons.

122.    The Wholesale Defendants and No-fault Clinics provided the means through which the Defendants were able to execute their scheme to defraud.

123.    In every instance, the wholesale invoices and prescriptions were provided with the knowledge that they would be submitted to insurers, in general, and Plaintiff, in particular, to obtain reimbursement under the No-fault Law in excess of the actual permissible charge for the DME and/or orthotic devices purportedly provided.

124.    In furtherance of the scheme to defraud alleged herein, QBS Solutions routinely submitted fraudulent bills seeking the maximum possible amount of reimbursement under the No-fault Law for expensive DME and/or orthotic devices that were never actually provided or not provided as billed and/or, if provided, provided pursuant to a predetermined course of treatment, without regard to medical necessity.

125.    In many cases, QBS Solutions never actually provided the DME for which it billed Plaintiff.

126.    In furtherance of the scheme to defraud alleged herein, like the wholesale invoices, QBS Solutions' bills intentionally omitted the make, model, and manufacturer of the DME and/or orthotic devices purportedly provided to Covered Persons in order to conceal the fact that the DME and/or orthotic devices purportedly provided were inexpensive and of poor quality, to the extent they were provided at all.

127.    In furtherance of the scheme to defraud alleged herein, upon receiving the wholesale invoices from the Wholesalers and/or other suppliers, QBS Solutions, as a matter of pattern and practice, generated and submitted bills to Plaintiff knowingly misrepresenting the type, quality, and cost of DME and/or orthotic devices purportedly purchased from the Wholesale Defendants and provided to Covered Persons.

128.    By way of example and not limitation, and as set forth in the "Non-Fee Schedule Scheme to Defraud" section below, Sofiev, through QBS Solutions, routinely submitted bills to Plaintiff for Non-Fee Schedule items wherein QBS Solutions misrepresented that: (i) the charges reflected on QBS Solutions' bills for Non-Fee Schedule items were the lesser of their acquisition costs or the usual and customary prices charged to the general public; and/or (ii) the Fee Schedule codes and descriptions contained in QBS Solutions' bills corresponded with the equipment purportedly provided.

129.    In addition, as set forth in the "Fee Schedule Scheme to Defraud" section below, Sofiev, through QBS Solutions, routinely submitted fraudulent bills to Plaintiff (i) in support of expensive custom-fabricated DME and/or orthotic devices, such as shoulder braces that were never provided; (ii) in support of expensive DME and/or orthotic devices that required a customized

fitting that they never performed; and/or (iii) which sought reimbursement rates under expensive

fee schedule codes for DME and/or orthotic devices that QBS Solutions never actually provided.

130.     In furtherance of the scheme to defraud and to maximize reimbursement from

Plaintiff, virtually every bill submitted by QBS Solutions deliberately obscured all identifying

information relating to the billed-for DME and/or orthotic devices so as to prevent Plaintiff from

determining the appropriate charges associated with any such DME and/or orthotic device or

whether the specific DME and/or orthotic device was medically necessary.

131.     In furtherance of the scheme to defraud alleged herein, Sofiev, through QBS

Solutions, routinely submitted fraudulent bills in support of expensive DME and/or orthotic

devices that required a custom fitting and/or adjustment which they never performed.  By way of

example and not limitation, Exhibit "3" in the accompanying Compendium of Exhibits is a

spreadsheet containing a representative sample of claims in which Sofiev, through QBS Solutions,

billed for expensive supports and/or braces that required fittings and adjustments which they never

performed.

132.     Defendants' activity promoted and facilitated other acts that imposed costs onto

Plaintiff well beyond the insurance proceeds that Defendants collected, including, but not limited

to, Plaintiff's expenditures for verifying each fraudulent claim through examinations under oath,

associated attorneys' and court reporting fees, independent medical examinations ("IMEs"), and

peer reviews.

## THE NON-FEE SCHEDULE SCHEME TO DEFRAUD

## 1.     Fraudulent Billing Using Fee Schedule Miscellaneous Codes

133.     In furtherance of the scheme to defraud alleged herein, Sofiev, through QBS

Solutions, routinely submitted bills for Non-Fee Schedule items using Fee Schedule code E1399,

which is reserved for miscellaneous items, and in doing so, they fraudulently misrepresented the nature and quality of the billed-for DME and/or orthotic devices and their acquisition costs. Exhibit "4" in the accompanying Compendium of Exhibits is a representative sample of claims in which QBS Solutions submitted fraudulent bills for Non-Fee Schedule items to Plaintiff using Fee Schedule Code E1399.

134.    By way of example and not limitation, Sofiev, through QBS Solutions, routinely submitted bills to Plaintiff for massagers using code E1399, in the amount of $139.50, falsely representing that the amount billed is the lesser of the usual and customary price charged to the general public or QBS Solutions' acquisition cost plus 50%, when, to the extent anything was provided, the massagers were simple, hand-held massagers for which the usual and customary price charged to the general public did not exceed $30.00.  Exhibit "5" in the accompanying Compendium of Exhibits is a representative sample of claims in which QBS Solutions submitted fraudulent bills for massagers to Plaintiff using Fee Schedule Code E1399.

135.    By way of further example and not limitation, QBS Solutions routinely submitted bills to Plaintiff for car seats using code E1399 in the amount of $84.00, falsely representing that that amount was the lesser of the usual and customary prices charged to the public or QBS Solutions' acquisition cost plus 50%, when, to the extent anything was provided, the car seats purportedly supplied were inexpensive bubble pads or other material for which the usual and customary price charged to the general public is not more than $13.00.  Exhibit "6" in the accompanying Compendium of Exhibits is a representative sample of claims in which QBS Solutions submitted fraudulent bills for car seats to Plaintiff using Fee Schedule Code E1399.

2.      **Fraudulent Billing of Non-Fee Schedule Items under Fee Schedule Codes**

136.    In furtherance of the scheme to defraud alleged herein, Sofiev, through QBS Solutions, routinely submitted bills to Plaintiff for Non-Fee Schedule Items using codes reserved for Fee Schedule Items in order to maximize the fraudulent charges they could submit to Plaintiff, despite the fact that they never provided the billed-for items.   By way of example and not limitation, Sofiev, through QBS Solutions routinely submitted bills to Plaintiff for an "egg crate mattress," a Non-Fee Schedule Item which is nothing more than a thin, foam mattress *pad*, using the Fee Schedule code E0272, which is reserved for a "Foam Rubber Mattress," reimbursable in the maximum amount of $155.52.

137.    QBS Solutions never provided a Foam Rubber Mattress to any Covered Person.

138.    To the extent any DME and/or orthotic device was provided, QBS Solutions provided simple bubble mattress pads, which it described as "egg crate mattresses," for which the usual and customary price charged to the general public did not exceed $25.00.

139.    By submitting bills using code E0272, Sofiev, through QBS Solutions, materially misrepresented that they provided Foam Rubber mattresses when they did not, and also materially misrepresented that the item purportedly provided was a Fee Schedule item, seeking reimbursement in amounts upwards of seven times what would otherwise have been a permissible charge for the Non-Fee Schedule item.  Exhibit "7" in the accompanying Compendium of Exhibits is a representative sample of claims in which QBS Solutions submitted fraudulent bills for egg crate mattresses to Plaintiff by billing for the Non-Fee Schedule DME under a Fee Schedule code.

## FEE SCHEDULE SCHEME TO DEFRAUD

**1.    Fraudulent Billing for Custom Fit DME and/or Orthotic Devices.**

140.    In furtherance of the scheme to defraud, Sofiev, through QBS Solutions, routinely submitted fraudulent bills in support of expensive pre-fabricated DME and/or orthotic devices that required a fitting and adjustment in which the device has been trimmed, bent, molded, assembled, adjusted, modified, or otherwise customized to fit a specific patient by an individual with expertise, which they never provided. *See* Durable Medical Equipment, Orthotics, Prosthetics and Supplies Policy Guidelines, New York State Department of Health (March 1, 2019), at 4; Durable Medical Equipment, Orthotics, Procedure Codes and Coverage Guidelines, New York State Dep't of Health (August 1, 2019), at 115.

141.    By way of example and not limitation, under the relevant Fee Schedule in existence at the time, the permissible charges for lumbosacral orthoses ("LSOs") range from $43.27, under code L0625 for basic, prefabricated LSOs dispensed off-the-shelf, to $1,150.00 under code L0632 for more complex LSOs that are custom fabricated.

142.    In furtherance of the scheme to defraud, and to ensure they received the maximum reimbursement permitted under the relevant Fee Schedule in existence at the time for LSOs, Sofiev, through QBS Solutions, routinely submitted bills for LSOs using codes reserved for prefabricated DME and/or orthotic devices that require a customized fitting, including L0627 and/or L0637, notwithstanding that a customized fitting was never performed. Exhibit "8" in the accompanying Compendium of Exhibits is a representative sample of claims where QBS Solutions submitted fraudulent bills for LSOs to Plaintiff using codes L0627 and/or L0637.

143.    To the extent any DME and/or orthotic devices were provided, Sofiev, through QBS Solutions, provided cheap, one-size-fits-all LSOs for which no customized fitting was ever performed.

144.    Under the relevant Fee Schedule in existence at the time, the permissible charges for knee braces range from $65.00, under code L1830, for a prefabricated knee brace dispensed off-the-shelf, to $1,107.70, under code L1844, for more complex models that are custom fabricated.

145.    Sofiev, through QBS Solutions, routinely submitted bills for knee braces using code L1820 and/or L1832, which is reserved for prefabricated DME and/or orthotic devices that require a customized fitting, which was never performed. By way of example and not limitation, Exhibit "9" in the accompanying Compendium of Exhibits is a representative sample of claims where QBS Solutions submitted fraudulent bills for knee braces to Plaintiff using codes L1820 and/or L1832.

146.    To the extent any DME and/or orthotic devices were provided, Sofiev, through QBS Solutions, provided cheap, one-size-fits-all knee braces, for which no customized fitting was ever performed.

147.    Under the relevant Fee Schedule in existence at the time, the permissible charges for a shoulder support range from $40.00, under code L3650, for a prefabricated shoulder support dispensed off-the-shelf, to $896.92, under code L3674, for more complex custom fabricated DME and/or orthotic devices.

148.    In furtherance of the scheme to defraud, and to ensure they received the maximum reimbursement permitted under the relevant Fee Schedule in existence at the time for shoulder supports, Sofiev, through QBS Solutions, routinely submitted fraudulent bills for shoulder supports using code L3960 notwithstanding that a customized fitting was never performed.  Exhibit "10" in

the accompanying Compendium of Exhibits is a representative sample of claims where QBS Solutions submitted fraudulent bills for shoulder supports to Plaintiff using code L3960.

149.     To the extent any DME and/or orthotic devices were provided, Sofiev, through QBS Solutions, provided cheap, one-size-fits-all shoulder supports for which no customized fitting was ever performed.

**2.     Fraudulent Billing of Cervical Traction Units**

150.     QBS Solutions routinely submitted fraudulent bills to Plaintiff for cervical traction units under Fee Schedule Code E0855.

151.     The cervical traction units purportedly provided by QBS Solutions are inexpensive replicas or knockoffs of a trademarked cervical traction units with a wholesale price that is a fraction of the cost associated with the authentic device. In that regard, to the extent anything was supplied to Covered Persons at all, QBS Solutions provided basic, inexpensive cervical traction units pursuant to a predetermined course of treatment, based on generic prescriptions, regardless of medical necessity and misrepresented the nature, quality, and cost of the items in each of the bills submitted to Plaintiff.

152.     By billing cervical traction units under code E0855, Sofiev, through QBS Solutions, falsely represented that they provided expensive, medically necessary cervical traction units when in actuality they provided cheap, inexpensive items that in many cases were replicas or knockoffs of trademarked items.  By way of example and not limitation, Exhibit "11" in the accompanying Compendium of Exhibits is a representative sample of claims where QBS Solutions submitted fraudulent bills for a cervical traction device to Plaintiff.

3.      **Fraudulent Billing for DME and/or Orthotic Devices Not Provided**

153.    In furtherance of the scheme to defraud alleged herein, Sofiev, through QBS Solutions, routinely submitted bills to Plaintiff for DME and/or orthotic devices that were never provided.

154.    By way of example and not limitation, Sofiev, through QBS Solutions, routinely submitted bills to Plaintiff for cervical collars under code L0180 in the amount of $233.00, which were not provided as billed, if any were provided at all. By way of example and not limitation, Exhibit "12" in the accompanying Compendium of Exhibits is a representative sample of claims where QBS Solutions submitted fraudulent bills for cervical collars to Plaintiff under code L0180 in the amount of $233.00.

155.    Under the relevant Fee Schedule in existence at the time, the permissible charges for cervical collars range from $6.80, under code L0120 for basic, flexible, foam collars, to $322.50, under code L0200, for more complex cervical collars with occipital and mandibular supports meant for patients with severe neck injuries.

156.    To the extent any DME and/or orthotic device was provided, Sofiev, through QBS Solutions, provided basic, inexpensive collars, based on generic prescriptions, regardless of medical necessity and misrepresented the nature, quality, and cost of the items in each of the bills submitted to Plaintiff.  The cervical collars were not complex cervical collars, but rather simple foam and/or semi rigid collars that would otherwise be reimbursable under codes L0120 or L0172.

157.    By billing for cheap, inexpensive foam cervical collars, and/or basic prefabricated two-piece semi-rigid thermoplastic collars under codes L0172 and/or L0180, Sofiev, through QBS Solutions, falsely represented that they provided complex, medically necessary collars, when they did not.

## MONEY LAUNDERING SCHEME

158.    Defendants knew that the money paid by insurers, in general, and Plaintiff, in particular, to QBS Solutions represented the proceeds and profits of their unlawful activity.

159.    To ensure that they would ultimately receive their ill-gotten gains, on information and belief, the Defendants engaged in a complex check cashing and/or money laundering scheme in furtherance of the scheme to defraud.

160.    These covert transactions were facilitated through various clandestine arrangements among one or more of the Retail Defendants, Wholesalers, check brokers (who acted as intermediaries between the check cashers and the Retail Defendants and one or more Wholesalers in order to conceal the true beneficiaries of the transactions) and check cashers.

161.    As described herein, on information and belief, QBS Solutions and one or more Defendant Wholesalers generated significant amounts of cash through transactions with check cashers and/or other financial arrangements.  This cash was used to facilitate, among other things: (i) the secret cash kickback arrangements between QBS Solutions and one or more Wholesalers that were essential to foster the illusion that QBS Solutions actually paid the inflated amounts for DME and/or orthotic devices reflected on the wholesale invoices; (ii) the secret cash kickback arrangements between QBS Solutions and No-fault Clinics, which were necessary to induce the clinics to supply QBS Solutions with prescriptions for bogus DME and/or orthotic devices; and (iii) QBS Solutions' and one or more Defendant Wholesalers' transactions, which were intentionally disguised as business expenses in order evade corporate tax liabilities through false deductions and/or the under reporting of income, thereby maximizing the Defendants' profits from, and enhancing their incentives to continue, the fraudulent activities described herein.

162.    As part of the scheme, one or more of the Defendants routinely presented numerous checks to check cashers that were structured in amounts slightly under the $10,000.00 floor that would have triggered compulsory reporting to the government.  These checks were: (i) payable to entities that maintained bank accounts, but had no apparent business or lawful purpose; (ii) payable to fictitious payees intended to conceal the true beneficiaries of the transactions; and/or (iii) presented by "brokers" who acted as intermediaries between the check cashers, QBS Solutions and Wholesalers in order to conceal the true beneficiaries of the transactions.

163.    On information and belief, in exchange for a nominal fee, nearly all of the cash generated by the check cashing transactions involving the Wholesalers was returned to QBS Solutions.  In particular, in furtherance of the scheme to defraud, to create the illusion that QBS Solutions paid the grossly inflated prices on the invoices provided by one or more Wholesalers, QBS Solutions issued checks to one or more Wholesalers, among others, for the full amounts reflected on the wholesale invoice(s).  QBS Solutions used those checks to demonstrate to Plaintiff, and others, that they paid the false wholesale invoice amounts and used the returned cash to pay kickbacks to, among others, the clinics that issued fraudulent and/or forged prescriptions for DME.

164.    In reality, on information and belief, one or more Wholesalers converted the checks they received from QBS Solutions to cash and secretly returned cash to QBS Solutions up to 98% of the wholesale invoice amounts.

165.    Through these transactions, QBS Solutions was able to surreptitiously obtain cash, which in turn would be used to, among other things, pay kickbacks to the No-fault Clinics in exchange for prescriptions of DME and/or orthotic devices, and to the Wholesalers in exchange for inflated wholesale invoices, thereby maintaining a symbiotic relationship necessary to facilitate the scheme to defraud.

## DISCOVERY OF THE FRAUD

166.    To induce Plaintiff to promptly reimburse their claims for DME and/or orthotic devices, Defendants have gone to great lengths to systematically conceal their fraud.  By way of example and not limitation:

- Sofiev, through QBS Solutions, routinely and deliberately: (i) failed to submit wholesale invoices with their initial bill submissions, thereby concealing the amounts that QBS Solutions actually paid for any DME and/or orthotic devices, the manufacturer, make, model, size and quality of the goods, and the actual value of the goods in a legitimate marketplace; or (ii) submitted fraudulent wholesale invoices from one or more of the Wholesalers, reflecting prices far in excess of those actually paid by QBS Solutions, to the extent necessary to support the fraudulent charges;

- With respect to Fee Schedule Items, Sofiev, through QBS Solutions, routinely misrepresented in the bills submitted to Plaintiff that they provided more expensive items from the middle or top end of the Fee Schedule, rather than the inexpensive, basic items that actually were supplied;

- Sofiev, through QBS Solutions, submitted false delivery receipts in support of their bills that purported to demonstrate the Covered Persons' receipt of the DME and/or orthotic devices, when, in actuality, the delivery receipts were routinely blank at the time the Covered Persons signed them;

- Sofiev, through QBS Solutions, systematically failed and/or refused to provide Plaintiff with a meaningful description of the DME and/or orthotic devices (*i.e.*, make and model) purportedly provided to Covered Persons, and/or additional information necessary to determine whether the charges submitted by QBS Solutions was legitimate.

167.    Plaintiff is under a statutory and contractual obligation to promptly and fairly process claims within 30 days. The documents submitted to Plaintiff in support of the fraudulent claims at issue, combined with the material misrepresentations, omissions and acts of fraudulent concealment described above, were designed to, and did cause Plaintiff to justifiably rely on them. As a proximate result, Plaintiff has incurred damages of more than $136,300.00 based upon the fraudulent bill submissions.

168.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from Plaintiff, Plaintiff did not discover and should not have reasonably discovered that their damages were attributable to fraud until shortly before they filed this Complaint.

## FIRST CLAIM FOR RELIEF

## AGAINST DEFENDANTS SOFIEV, ABC CORPORATIONS 1 THROUGH 5 AND JOHN DOES 1 THROUGH 5

## (RICO, pursuant to 18 U.S.C. § 1962(c))

169.    The allegations of paragraphs 1 through 168 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

170.    At all times relevant herein, QBS Solutions was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

171.    From, in or about February 28, 2018 through the date of the filing of this Complaint, Defendants Sofiev, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, knowingly conducted and participated in the affairs of the QBS Solutions enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

172.    At all relevant times mentioned herein, Defendant Sofiev, together with others unknown to Plaintiff, exerted control over and directed the operations of the QBS Solutions enterprise and utilized that control to conduct the pattern of racketeering activities that consisted

of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiff American Transit Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

173.     On information and belief, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Sofiev required, in furtherance of the scheme to defraud, to obtain payment from Plaintiff for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

174.     On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 5, through one or more of the ABC Corporations 1 through 5, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiff.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

175.     The racketeering acts set forth herein were carried out on a continued basis for more than a four-and-a-half year period, were related and similar and were committed as part of the ongoing scheme of Defendants Sofiev, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

176.     This pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as QBS Solutions continues to pursue collection on the fraudulent billing to the present day.

177.     As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Sofiev, with the knowledge and intent of one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiff and to induce Plaintiff to issue checks to the QBS Solutions enterprise based upon materially false and misleading information.

178.     Through the QBS Solutions enterprise, Defendant Sofiev submitted hundreds of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to hundreds of Covered Persons as billed. The bills and supporting documents that were sent by Defendant Sofiev, as well as the payments that Plaintiff made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Sofiev, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the QBS Solutions enterprise through the filing of this Complaint.

179.     A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Sofiev, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

180.   Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

181.   Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

182.   By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiff American Transit Insurance Company have been injured in their business and property and Plaintiff has been damaged in the aggregate amount presently in excess of $136,300.00, the exact amount to be determined at trial.

183.   Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover from Defendants Sofiev, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

**SECOND CLAIM FOR RELIEF**

**AGAINST DEFENDANTS QBS SOLUTIONS AND SOFIEV**

**(Common Law Fraud)**

184.   The allegations of paragraphs 1 through 168 are hereby repeated and realleged as though fully set forth herein.

185.   Defendants QBS Solutions and Sofiev made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiff American Transit Insurance Company for payment.

186.    Each and every bill and supporting documentation submitted by Defendants QBS Solutions and Sofiev to Plaintiff set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to Covered Persons. The false representations contained therein not only were intended to defraud Plaintiff but constitute a grave and serious danger to the Covered Persons and the consumer public.

187.    Defendants QBS Solutions and Sofiev intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality, and cost of the DME and/or orthotic devices purportedly supplied to Covered Persons;

- False and misleading statements as to the amounts QBS Solutions was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiff that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the Covered Persons;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiff misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to Covered Persons, generically describing the item to conceal the type of item being prescribed;

- • False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that the (a)  DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Sofiev, through QBS Solutions, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices were not covered by the New York State Medicaid Fee Schedule; and (c) DME and/or orthotic devices were generically described on the prescriptions, all of which was designed to permit Defendant Sofiev, through QBS Solutions, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiff and other insurers.

188.   The foregoing was intended to deceive and mislead Plaintiff into paying Defendant QBS Solutions' claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

189.   Defendants QBS Solutions and Sofiev knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiff to rely thereon.

190.   Plaintiff did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiff was led to believe existed as a result of the acts of fraud and deception of Defendants QBS Solutions and Sofiev.

191.   Had Plaintiff known of the fraudulent content of the bills, prescriptions, and delivery receipts, it would not have paid the Defendant QBS Solutions' claims for No-fault insurance benefits submitted in connection therewith.

192.   Furthermore, the far-reaching pattern of fraudulent conduct by Defendants QBS Solutions and Sofiev evinces a high degree of moral turpitude and wanton dishonesty, which, as

alleged above, has harmed, and will continue to harm the public at large, thus entitling Plaintiff to recovery of exemplary and punitive damages.

193.    By reason of the foregoing, Plaintiff American Transit Insurance Company have sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $136,300.00, the exact amount to be determined at trial, plus interest, costs, punitive damages, and other relief the Court deems just.

## THIRD CLAIM FOR RELIEF

## AGAINST DEFENDANTS QBS SOLUTIONS AND SOFIEV

## (Unjust Enrichment)

194.    The allegations of paragraphs 1 through 168 are hereby repeated and realleged as though fully set forth herein.

195.    By reason of their wrongdoing, Defendants QBS Solutions and Sofiev have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiff American Transit Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

196.    Plaintiff is therefore entitled to restitution from Defendants QBS Solutions and Sofiev in the amount by which it has been unjustly enriched.

197.    By reason of the foregoing, Plaintiff American Transit Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $136,300.00, the exact amount to be determined at trial, plus interest, costs, and other relief the Court deems just.

## FOURTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 5 AND JOHN DOES 1 THROUGH 5

### (Aiding and Abetting)

198.    The allegations of paragraphs 1 through 168 are hereby repeated and realleged as though fully set forth herein.

199.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiff American Transit Insurance Company by Defendants QBS Solutions and Sofiev.

200.    On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants QBS Solutions and Sofiev purportedly provided to Covered Persons; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants QBS Solutions and Sofiev could mail fraudulent bills to Plaintiff and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Sofiev, through QBS Solutions, to QBS Solutions to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiff, among others, through QBS Solutions; and (v) knowingly supporting the negotiation and

performance of kickback agreements between Sofiev, through QBS Solutions, and the No-fault Clinics.

201.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants QBS Solutions and Sofiev to obtain fraudulently inflated payments from Plaintiff, among others.

202.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiff into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Law, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

203.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5) caused Plaintiff American Transit Insurance Company, to pay money based upon the fraudulent charges submitted through QBS Solutions in an amount to be determined at trial, but in no event less than $136,300.00.

204.    On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiff to recover punitive damages.

205.    By reason of the foregoing, Plaintiff is entitled to compensatory and punitive damages, plus interest, costs, and other relief the Court deems just.

### FIFTH CLAIM FOR RELIEF

### AGAINST THE RETAIL DEFENDANTS

### (Declaratory Judgment under 28 U.S.C. § 2201)

206.    The allegations of paragraphs 1 through 168 are hereby repeated and realleged as though fully set forth herein.

207.    At all relevant times mentioned herein, each and every bill mailed by Sofiev, through QBS Solutions, to Plaintiff sought reimbursement in excess of the amounts authorized by the No-fault Law and New York State Medicaid Fee Schedule by materially misrepresenting the DME and/or orthotic devices provided, if provided at all, as well as the cost and quality of the billed for DME and/or orthotic devices.

208.    To the extent the DME and/or orthotic devices were provided at all, each item was a basic, low-quality piece of medical equipment for which QBS Solutions' wholesale cost was a mere fraction of the amount they charged Plaintiff and/or was medically unnecessary because it was provided pursuant to a predetermined course of treatment, irrespective of medical need.

209.    At all times relevant herein, the Retail Defendants exploited the No-fault Law and New York State Medicaid Fee Schedule through the utilization of various deceptive billing tactics engineered to maximize the amount of reimbursement from insurers, in general, and Plaintiff, in particular, through the submission of fraudulent billing documents that misrepresented the nature, quality and cost of items that both are and are not listed on the relevant fee schedule purportedly provided to Covered Persons.

210.     In view of the Retail Defendants submission of fraudulent bills to Plaintiff, Plaintiff contend that the Retail Defendants have no right to receive payment for any pending bills they have submitted because:

- The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiff to obtain reimbursement far in excess of the maximum permissible charges they could submit to Plaintiff;

- The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiff seeking reimbursement for DME and/or orthotic devices that they never supplied to Covered Persons.

211.     As the Retail Defendants have knowingly made the foregoing false and fraudulent misrepresentations about the DME and/or orthotic devices purportedly supplied to Covered Persons and the amounts they were entitled to be reimbursed, which they never supplied to Covered Persons, in order to manipulate the payment formulas under the No-fault Law and New York State Medicaid Fee Schedule in their claims submissions and obtain reimbursement far in excess of the maximum permissible charges they were entitled to receive, it is respectfully requested that this Court issue an order declaring that the Retail Defendants are not entitled to receive payment on any pending, previously-denied and/or submitted unpaid claims and Plaintiff, therefore, are under no obligation to pay any of Retail Defendants' No-fault claims.

212.     Plaintiff has no adequate remedy at law.

213.     The Retail Defendants will continue to bill Plaintiff for false and fraudulent claims for reimbursement absent a declaration by this Court that Plaintiff has no obligation to pay the pending, previously-denied and/or submitted unpaid claims, regardless of whether such unpaid claims were ever denied, regardless of the purported dates of service.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury.

**WHEREFORE,** Plaintiff demands judgment as follows:

i)     Compensatory damages in an amount in excess of $136,300.00, the exact amount to be determined at trial, together with prejudgment interest;

ii)     Punitive damages in such amount as the Court deems just;

iii)     Treble damages, costs, and reasonable attorneys' fees on the First Claim for Relief, with prejudgment interest;

iv)     Compensatory and punitive damages on the Second Claim for Relief, with prejudgment interest;

v)     Compensatory damages on the Third Claim for Relief, together with prejudgment interest;

vi)     Compensatory and punitive damages on the Fourth Claim for Relief, with prejudgment interest;

vii)     Declaratory relief on the Fifth Claim for Relief, declaring that Plaintiff has no obligation to pay any No-fault claims submitted by the Retail Defendants because (1) the Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiff about the DME and/or orthotic devices purportedly supplied to Covered Persons and the amounts they were entitled to be reimbursed in order to manipulate the payment formulas under the No-fault Law and New York State Medicaid Fee Schedule in their claims submissions and obtain reimbursement far in excess of the maximum permissible charges they could submit to Plaintiff; and (2) The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiff about the DME

and/or orthotic devices purportedly supplied to Covered Persons by submitting claims for DME and/or orthotic devices that they never supplied to Covered Persons; and

      viii)    Costs, reasonable attorneys' fees, and such other relief that the Court deems just and proper.

Dated: New York, New York,
       October 28, 2022

           Morrison Mahoney LLP

           By:   /s/ Lee Pinzow
               Robert A. Stern, Esq.
               James McKenney, Esq.
               Jennifer Chan, Esq.
               Lee Pinzow, Esq.
               Attorneys for Plaintiff
               Wall Street Plaza
               88 Pine Street, Suite 1900
               New York, New York 10005
               (212) 825-1212

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMERICAN TRANSIT INSURANCE COMPANY,<br><br>                              Plaintiff,<br><br>        -against-<br><br>QBS SOLUTIONS INC., JOSEPH SOFIEV, JOHN DOES 1 THROUGH 5 AND ABC CORPORATIONS 1 THROUGH 5,<br><br>                              Defendants. | CIVIL ACTION<br><br>22-CV-6585<br><br>COMPLAINT<br><br>(TRIAL BY JURY DEMANDED) |

# COMPLAINT

**MORRISON MAHONEY, LLP**
**ATTORNEYS FOR PLAINTIFF**
**WALL STREET PLAZA**
**88 PINE STREET, SUITE 1900**
**NEW YORK, NEW YORK 10005**
**TELEPHONE: (212) 825-1212**